We'll hear argument first this morning in case number 126 on the original docket, Kansas v. Nebraska and Colorado. Mr. McAllister. Mr. Chief Justice, and may it please the Court, Kansas seeks to ensure that Nebraska has effective incentives to comply with its compact obligations every year, including the years when water is scarce. To achieve that goal, Kansas asked this Court to take two measures. First, award a significant amount of disgorgement for Nebraska's massive gain from its compact violation. And second, decline to rewrite the detailed and complicated settlement agreement that the parties reached in 2002, an agreement that is full of compromises and concessions on all sides. Ultimately, Kansas wants to receive the water to which it is entitled year in and year out, including especially when water is scarce. The best way to achieve that is to impose significant disgorgement for Nebraska's massive gain and leave any changes to the accounting procedures to the parties and to the process that has been created under the compact, the RRCA. I'd like to start with the accounting procedures argument. Nebraska and the Master suggest that the Court should rewrite the way we calculate Nebraska's consumption of imported water supply, but Kansas disagrees that that's appropriate here for several reasons. First of all, that agreement itself was a complex set of concessions and compromises. The model is at best an estimation of what's going on in the basin. No one actually knows, perhaps can know, how much imported water comes over from the plat or how much actually gets consumed. The parties were aware of the very phenomenon that the Master and Nebraska focus on. What if we know roughly what the amount of extra, I don't know what the word, liability on Nebraska is. What if it were way off? What if the formula resulted in Kansas getting 50 percent more water than the parties anticipated? Still no authority to revise the formula? Well, Your Honor, I think if the argument is there's a mistake, then we have to find an actual mistake. That's what justifies the extraordinary remedy of reformation. But I thought it was agreed that the compact itself doesn't govern imported water, which this procedure covers. So if it's not within the compact itself, then how can it stand? Well, Your Honor, it's not as black or white as the Master said. By implication, the compact does not cover imported water. It never actually uses the words imported water. It talks about the virgin water supply. And it's certainly the party's goal to try to exclude the imported water from the calculation. But we did that very deliberately with the imported water supply credit, which is very substantial and which Nebraska gets. But I thought that the parties were not aware of the error that proved beneficial to Kansas. So you say that there were many compromises, tradeoffs, but in this particular result, the parties were not aware that the counting procedures would include this imported water. Well, I disagree with that statement, Your Honor. They were aware that it could. There may not have been awareness of the magnitude potentially of the situation and whether, in fact, it would arise. But the parties, there's evidence, for example, Colorado's expert was asked, when did you first realize this could happen under the model? And he said about 15 minutes after I looked at it. The Kansas expert also recognized it was possible. All of this is an estimation. And what happens, in our view, is Nebraska is saying, well, now we think we've come up with a better way to more accurately measure this based on new information, new modeling techniques that may be available. But there's a mechanism for making those changes, and it's through the RRCA process. It wasn't a mistake. They just think they've got a better way to do it now. Now, what is that mechanism? What does that process entail? That process entails the chief water officers of each State, and they meet regularly, and they can and have considered changes to both the accounting procedures and the model. Both have been changed over time by agreement of the RRCA. It's kind of like what was at issue in the Texas v. New Mexico, except there it was just two States and they each had to agree. Now it's three States, and each has a vote. And if all three States agree on a change, then a change is made. Breyer. Would you accept that, then, that we send it to that group, and the group tries to work it out? And if they fail to work it out, the master imposes a solution? Well, that's where we disagree that the RRCA doesn't. I know. I don't understand, because I thought, as it turns out, when this river is dry, as it sometimes is, and there's no water in there, that Nebraska, they don't, they use only imported water, which they should have every right to take all of it if they wanted to. But nonetheless, due to a mistake in the model, it counts it as if they were taking all the Republican river water. Well, nobody wanted that. That would be totally unfair. And that's what the master says. And so they made a mistake about how the model worked. So what do you suggest we do about the mistake? Nothing? I suggest you do nothing about the mistake. In which case, if we do nothing, it's like as if I were to enter into an agreement and I bought 17 cows from the barn, and it turned out the barn didn't have any cows. It just had horses. Okay? So we're under a mutual mistake. Now, what do we do? Well, except I disagree with the premise that it's a mutual mistake, Your Honor. Oh, but there's a finding that the mistress certainly characterizes it that way. Yes. All right. Now, if I accept the master's characterization, what is it I'm supposed to do, in your opinion? I don't think if you have the cow or horse or something and everybody agrees it's a mistake, or if they don't, the judge finds it's a mistake, then what is a court supposed to do? Well, again, two things. Reformation requires clear and convincing proof of an actual mistake. Kansas doesn't believe that's present. But then the purpose of reformation is to put together what the parties actually intended. And there's no real argument that what the parties intended was the particular five-run solution. All right. Now, is it all right with you if we were to write these words, you agree, Kansas, agrees, the object is to get what the parties really intended, therefore, send it to this group? And if the group agrees, fine. And if they don't agree, special master, you impose what the parties really intended. And, of course, if they don't accept that, they can always appeal here. But nonetheless, that would be a way of resolving it. That would be a way of resolving it. What's wrong with that? Or could you have a better way? Well, one problem with the master solution, the five-run solution, is all he is concerned about is the imported water supply. That's only one piece of this. I think your objection is that what the parties really intended was to adopt this particular formula, which they knew might be inaccurate. And that's what's the parallel is not buying horses in a barn, but buying whatever animals are in the barn. Although both parties believed it was a mix, it turns out that was wrong. But the deal was the deal, right? They were rolling the dice. That is fundamentally the Kansas position, because I would like to emphasize the tradeoffs that went into this. We did give Nebraska a substantial imported water supply credit. There are, in fact, questions about whether some of that water is actually Republican River water being counted as imported water. You want us to apply ordinary contract principles on this issue of reformation. Is that right? Well, yes. I mean, the high level of — it's an extraordinary remedy and difficult to achieve. And it's only to be used to put in place what the parties actually intended when somehow they've mistakenly done it. Do you want us to do the same thing on the issue of disgorgement? Well, disgorgement, in our view, is different, Your Honor, because — You want us to apply ordinary contract principles. You can for disgorgement, although there are other theories that also support and justify disgorgement, which the Master recognized here. So the fact that the compact also has status as a statute is one. The fact that what's really being affected is downstream water rights, real property, that's another theory. We argue there's an analogy to fiduciary duty. We're not saying there is a fiduciary duty. But my point is disgorgement can be justified by more than contract principles here. That is one basis for justifying it. But what I wanted to say to Justice Scalia's point, we gave Nebraska several things in that agreement. And we knew this model wasn't perfect. It can't be. It never will be. It's too complicated. There's too many unknowns. We gave Nebraska a high credit for groundwater recharge at a percentage much higher than Colorado and Kansas get. And Nebraska quoted about that as a concession they got from Kansas that was worth 15 to $20 million annually. That's Exhibit K133 in the record. We also gave up all claims for any potential compact violations prior to the agreement. Roberts. I thought the Special Master specifically found that this was not part of the bargaining and tradeoff. The Special Master was focused on the bottom line notion that somehow we were supposed to reach a bottom line accounting.  But the Federal government did not purposely negotiate for calculating all of these factors, the imported water supply credit, the consumption of each State the way we did. Kansas specifically wanted the mound turned on as these calculations were made. Scalia. How do we decide this? Is this a question on which we have to defer to the master's fact-finding? Is it a question of fact what the parties intended? Or are we to look at the agreement and decide it from the agreement? Well, I think you can certainly decide it from the agreement, Justice Scalia. I think the Court's cases have said things like you give respect to the master's findings. But it is actually a de novo proceeding, so there's no deference that has to be given to the master's findings. And here, the agreement itself would be. Well, I'm going to give more deference, I suppose, if I think it is entirely relevant what the prior negotiations were and that it was appropriate for him to look into that. And to reach the conclusion he did. Well, I think you could reach the. If, on the other hand, I think it's the text of the agreement that governs, I don't care what he found about the negotiations. And I think you could certainly ignore the negotiations. What I'm saying is you can look in that agreement and find many tradeoffs, some of which benefited Nebraska significantly, some of which may benefit Kansas and Colorado. Kennedy, as you understand it, does the — do both parties agree that we treat this as an application of Reformation principles in an ordinary contract, or is there some argument that because this negotiation was pursuant to provisions where a special master's participation somehow gives this contract an equitable character and makes it easier to reform? Does anybody argue the latter? Certainly Kansas doesn't. I can't speak for Nebraska. Well, I want you to know, as I understand Nebraska's position, they argue that ordinary contract principles apply. I may be wrong. That's — I agree. That's my reading. So I don't think anyone is suggesting a lesser standard. And in fact, taking it back to Special Master McKusick, when he approved this, at the urging of people, including my colleague Mr. Cookson, who said, Special Master, this is close enough. You know, it's not perfect, but everything comes out in the wash. It's more or less a good deal for everyone. And Special Master McKusick said no party represents this as perfect and that there might not be other ways to do this, but this is a reasonable way to resolve the dispute in 2002. Sotomayor, can I try to better understand what you think would have been different in the contract? Suppose that Nebraska had come in with the Five-Run Proposal Act when you were negotiating this and said, this is really a much better way of doing what we all agree we ought to do, which is separate out the virgin water from the imported water. What would have been different in the contract? What would you have done — what provisions would you not have had if that Five-Run Proposal had been there and you had accepted it? Well, I can mention three or four things that might be different. Obviously, it's hypothetical, but one thing that the Five-Run solution does is it does take care of the imported water issue, but it actually increases the problem with the unaccounted-for depletions from groundwater pumping, which is what the whole prior round of litigation was about, was that those count under the Compact II. And so the master solution may solve, if you will, one problem. The problem Nebraska sees, it exacerbates another problem. So we'd certainly want to talk about that. That was what the 16-Run solution did a better job of, but Colorado objected to that because their ox was being gored. That's why they came around when they made a deal with Nebraska to the Five-Run. But the other things that could be negotiated here, certainly their groundwater recharge amount is very generous to them. Again, they said $15 to $20 million annually that's worth. We could revisit that. We could revisit an issue of they get credit for water that's coming back on irrigated lands to the groundwater, but some of that is probably precipitation that's infiltrating. That's not fully accounted for. Even the imported water supply credit is probably unduly generous because it likely includes some Republican basin water in it. So what I'm suggesting, I think there are a number of things we could negotiate about, but it's not fair to pick out this one thing that the master got focused on and saw as a black or white issue when it's really not. And so I'm going to fix this one thing. And too bad Kansas and even perhaps Colorado, everything else we're not going to touch. It all should go to the RRCA process or it all should be in play here. But our preference is that it goes to the RRCA process. That's where the States can negotiate this out. Sotomayor, Mr. McAllister, I thought that the special master, if I read his report right, had invited you to come in and tell him a better solution to the problem. And you guys didn't put the fourth one. Well, my understanding is Kansas had worked on one, sometimes referred to as the integrated solution, I think, and it was to approximate closer what we call the virgin water supply metric, but had not had time, did not get it developed. These things are not just spur of the moment you can come up with. So let's assume, as we have, that we're going to credit. I know you don't want us to, but let's assume that we're going to credit the special master's finding that this was a mutual mistake. Generally, as I understand it, under ordinary contract principles, the remedy is not contract formation. It's rescission. And I don't think you want that. Well, I don't know that any of us would want that. All right. So if you don't want rescission, what you're left with is contract formation. And you're absolutely right. The parties never discuss this 5-1 solution during their negotiations. So it's not as if you're reforming the calculus. You're reforming, you're trying to fix the mistake. So what's left? Equitable and just solution. And if you didn't put forth an alternative, why shouldn't we accept the special master's judgment on the 5-mile run? Well, one reason we didn't put forth the alternative is this notion of mutual mistake actually came up extremely late in the process. It wasn't until the very end. In fact, Nebraska alone didn't call it that. They talked about changing the accounting procedures, and it was the master who finally labeled it as a mutual mistake and said, oh, it's a mutual mistake. It seems to me it's rather like asking a man who believes he's been wrongfully convicted whether he would like to die by the firing squad or the electric chair. I mean, you didn't want any remedy to be imposed. Exactly. And for the master to ask you, oh, you tell me what remedy I should impose. You don't think he should impose any. He shouldn't. I don't blame you for not telling him. You say this problem should go to the RCRA process. Each State has a representative. Your representative has an absolute veto in the RCRA process. And so does each of their States. So you're feeling pretty good about your chances if you send it back to the RCRA. No, Your Honor. I would tell you a quick story and then make a point about that. A quick story that 20-some years ago Kansas introduced a resolution in the RRCA that said how about we all resolve that we will comply with the compact. Kansas voted yes, Colorado voted yes, and Nebraska voted no. So this goes back a long ways. But I think if the notion is that's why I think it's unfair to pick out the five-run solution. The things I just mentioned to Justice Kagan, if we talked about infiltration by precipitation, if we talked about the groundwater recharge amounts, if we put other things on the table, then I think we have things to talk about including the five-run solution. But Nebraska just wants to pull out this one thing and have it mandated in their favor, no negotiation. I mean, the fact that negotiation can work is demonstrated by Colorado here initially being sided with Kansas, both opposing the 16-run solution. And then Nebraska came along and said, well, let's try a different way. And Colorado said, well, actually, that way works to our advantage. We like that. We'll go along with that. That shows that the negotiation and the horse trading can work in this setting if given a chance. But I do think we have to have more than one thing to negotiate over. The other point I'd make about this. There were other issues like this that favored Nebraska. So that if the accounting procedure was going to be opened up on this point, that there were other things that the special master should have considered. I believe the litigation in front of the special master, Justice Ginsburg, was mostly just saying you shouldn't change anything, you should leave this to the process. I'm not sure in front of the master we got deeply into other things that might be changed with regard to the model. Ginsburg. What would happen? And I think Justice Breyer asked you. If it goes to the commission and they are unable to agree, what's the next step? Well, there is the option of nonbinding arbitration, which we all love and almost always works out our disputes. And then from there it would go presumably to try, you know, if any of the States feel strongly enough about it, would probably come back with a request for a special master. But, again, I don't think we'll get there because the parties can and have negotiated successfully. When we can't do it is when you pick out one discrete thing and put the court or the master's thumb on the side of the State. Well, then there's nothing left to negotiate about. But the veto is nothing new in the compact territory. I mean, this was true in Texas v. New Mexico. Either State could disagree and nothing could happen. And the Court said in that setting, so be it. That's the system the States created under their compact. Here it's a three-way. It's been a while since I read the briefs in total, but I thought you had gone through all those other alternatives before filing the petition here for a special master. On our issues. On the five-run, no. I mean, that's something Nebraska brought in as a counterclaim for the special master. I see. Okay. So on the issues Kansas pressed, absolutely. The disgorgement issue, you had failed on that. Well, in arbitration, I think we were trying to establish whether there was a compact violation and the amounts and so forth, and there was some discussion of the accounting procedures. But then we brought the case to this Court because we believed there was a compact violation that required a remedy. And all the parties, let me speak to remedy for just a moment before I sit down. All the parties agreed the remedy should be money here. It's not a perfect remedy. It doesn't really substitute for the water that people didn't receive in the years that they needed it and were supposed to receive it. But it's the remedy we've agreed on. I will say the reaction in the ---- You got money. You got money, didn't you? You got damages. We got damages less than ---- But you want more than damages. You want to say I not only want to receive what it cost me, what your violation cost me, but I want in addition to receive any benefits that you got from the violation. In order to stabilize the compact, I think that's ---- That's not a normal contract remedy. It's not necessarily a common one, but it's a recognized one in a situation where the master suggests Nebraska gained at least perhaps 25 million from the breach. If it only has to pay Kansas 3.7, then next time conditions are dry, there's little incentive, especially when it takes us 8 years basically to get from the point of breach to even the possibility of recovery. But this is not a case where Nebraska was found to have intentionally violated the agreement on the ground that it would be efficient to do that. Isn't that right? Well, they didn't. The master found that they knowingly exposed Kansas to a risk of violation of the compact. They didn't purposely set out to violate the compact, but they did. I think you have to say it's more than negligent. They had notice every year around by June 1 of what their consumption was the previous year, and for 4 years in a row. They didn't just exceed a little bit. They blew past their allocations. I mean, these were massive violations on Nebraska's part, knowing they were in trouble and just really not taking any kind of adequate steps. And that's what the master reacted to, and so does Kansas, and urges the Court, I'd like to reserve the remainder of my time for rebuttal if I could. But nothing less than a substantial disgorgement award seems to really get their attention. And here it has gotten their attention and has also gotten Colorado's attention, as you see in the briefs. Thank you, counsel. Ms. O'Connell. Mr. Chief Justice, and may it please the Court. There are two primary points that the United States would like to make. First, it is important that disgorgement be an available remedy for breach of an interstate water compact. Unlike a regular contract between private parties, interstate water compacts are laws of the United States that apportion a scarce resource among sovereigns. It is important that water flows down the river, not just money, and the availability of a disgorgement remedy will help to stabilize compacts and ensure that States are working vigorously to meet their compact obligations. You can say the same about contracts. I mean, nobody is saying that disgorgement is not a remedy for contracts, right? That's right. The problem is, what should be the conditions under which disgorgement is imposed? Does it require an intentional violation or not? That's all the debate is about here. Right. And it typically does for disgorgement of profits or some amount of profits. And although Section 39 of the Restatement of Restitution and Unjust Enrichment, that's the provision on opportunistic breach, says that it requires a deliberate breach, and the master did find here that this was not deliberate. We were drawn to that provision because the Court has said repeatedly a compact is like a contract, but there are lots of principles that are equally applicable here, including Section 40 of the Restatement, which talks about interference with property rights. And if you interfere with another party's property rights and gain a profit from that, then the remedy for a conscious wrongdoer, and I think the master's finding or conclusion about Nebraska's intent here is that of a conscious wrongdoer, that they knowingly exposed Kansas to a risk of a breach. But what is the statement based that on? Did you just make it up? Are there a lot of cases that say that? About what? Just because the restatement says it, we've got to believe it? How many cases are there that impose disgorgement where there is no intentional   Do you have a lot of cases? There's no deliberate violation. But I think if you're finding that somebody is a conscious wrongdoer and that they recklessly violated the compact, which I think is about what the conscious wrongdoer standard is akin to, then, yes, I mean, certain. That's not enough for normal contract disgorgement, is it? No, I think it is. You need intentional violation, don't you? If you're only looking at the contract provision of the restatement, then it typically requires a deliberate opportunistic breach of the contract. Exactly. And you say there's an exception where it's property rights involved. And I'm asking you, what cases do you have for that? You see, I don't think the restatement can change our law by just saying something, by consensus of law professors. Are there cases that have established that rule? In Texas v. New Mexico, the Court, when it was talking about why awarding money damages is not, shouldn't be a concern that States will just continue to violate compacts as long as they can send money down the river, the Court said we don't really need to worry about that because there's always the possibility of ordering specific performance plus whatever additional penalty might be warranted for a deliberate breach. And even the Court wasn't saying in that case it has to be deliberate or setting forth a legal standard, but I think this Court has indicated that disgorgement may be appropriate when you have an intentional breach or something there. If there — if disgorgement is appropriate, and I have a question about that, where did this $1.8 million figure come from out of thin air? Is this an approximation of attorney's fees or expert costs or what? Where did it come from? I think it's the one part of the special master's opinion that is pretty much unexplained. And we're not here to defend $1.8. I think we said this in footnote 1 of our brief. It's not our intention to say that we think $1.8 is the exact right amount. What we are saying is that the master, because he weighed all of the different things that you would want to look at when you're determining whether you want to look at disgorgement, whether Nebraska profited, whether Nebraska had intent or was a conscious wrongdoer, whether there was any need for deterrence. The master looked at all of the things that you should be looking at. Kagan Well, how would you set the amount in a circumstance like this? What would you think an explanation would look like? O'Connell Well, we haven't taken a position on what exactly the amount should be. What we tried to say in the brief is that if the court wanted to go with what the special master said and award $5.5 million, which is a disgorgement of part of Nebraska's gain, then it could be satisfied that that's not an arbitrary amount. I mean, to some extent, any amount you choose if you're balancing equities would be arbitrary. But I think what the court would want to do is to point out that Nebraska profited, and one of the purposes of disgorgement is to relieve a wrongdoer of unjust enrichment, that Nebraska, there is a finding that they knowingly exposed Kansas to this risk. It's a finding of a conscious wrongdoer. I mean, the master took business. Kagan This 1.8 seems to be much less than the amount of unjust enrichment that the master was suggesting Nebraska had gained. So if he's not going to do the full measure of unjust enrichment, what's he supposed to do? Or is he supposed to do just that? If the master thinks that disgorgement is necessary, you look to the unjust enrichment. That's the number you choose. There's no other discretion. Or is there some other discretion? And if so, what would you look to and how would you base the award? I think there is discretion, and there is certainly support for that in the restatement, where if you are, you know, if you're a conscious wrongdoer, you can typically get your profits taken away. If you're an innocent party, you might just have the property taken away from you, but you can keep the profits. If you're somewhere in the middle, if you're negligent or it's just an ordinary breach of contract, restatement section 52 says that you can choose or adjust the wrongful conduct of the party. Scalia. So, Connell, we've had a lot of compact, water-compact cases before this Court. I mean, a lot. Can you give us one case in which we have imposed disgorgement, even, even for an intentional violation? No. And I think that's the second question is how many for an unintentional violation? The Court. Minus something, right? The Court has indicated in Texas v. New Mexico that disgorgement could be a possible remedy. It's certainly left that door open. For an intentional violation. Yes. But we've never done it, have we? No. And this is a novel. Voted stick them, right? Well, in that case, sure. But, I mean, the Court certainly has left that open. And, Justice Kagan, to get back to the question, I think that if you really thought that somebody was a conscious wrongdoer and you thought all of their profits should be disgorged, then you could do that. I think the Master was also weighing some other things here. Unjust enrichment is not the only purpose of disgorgement, but also a need to deter is something else that you look at. And what the Master concluded here was that Nebraska had all the tools in its toolkit now to comply with the compact going forward, and that perhaps the $1.8 million was just the push it needed to make sure that it was conscientiously using those tools that it had. We're dealing here with an agreement between States. And it seems to me particularly important that they have some idea about what they're agreeing to based on our precedent. And particularly since the Special Master, according to your position, has such broad discretion, it can be zero, it can be $20 million, whatever the maximum is here. I'm not sure that the States bargained for that exposure. Well, when the States agreed to an equitable apportionment of the compact, I mean, this Court does have all of the tools of equity available to it to ensure that there's a fair solution imposed. And it's not just the Special Master's decision. I mean, this Court could certainly award a different amount of damages. It is de novo review. It's up to you to determine what you think is fair. I think what we've put forth is that if you wanted to go with and give some preference to what the Special Master did, that $5.5 million is not an arbitrary amount based on the weighing that he did. Kagan, can I understand your position, Ms. O'Connell, on whether this is just a contract or whether it's something else entirely? I mean, should we be looking solely to contract rules, or is your position that because public rights and public interests are affected here, we have a different kind of obligation? I think it's not specifically just contract rules when the Court is exercising its original jurisdiction. The Court has said many times in Ohio v. Kentucky that its jurisdiction in original cases is equitable. It's an equitable division of the water that underlies the compact, and so the Court is just deciding what it thinks is fair. Scalia, a lot of contracts you, my goodness, equity courts adjudicate contract rights sometimes. Right. So, I mean, the issue is whether normal contract principles apply, whether they are the principles dealing with law or the principles dealing with equity. I mean, disgorgement is an example. Right. And normal contract principles say an equity court will not give disgorgement unless there's an intentional violation. So I don't think your appeal to equity carries the day at all. Justice Scalia, though, I do want to point out that the deliberate breach that you're talking about is a deliberate breach of the parties' rights. As I mentioned before, there's a lot of different analogies to what's happened here, and one of them is interference with somebody's property. And if there is a — it doesn't just have to be deliberate, but just, you know, a knowing risk or recklessness can also qualify there. And if I could talk, since we took time from both parties, about the accounting procedures for Justice — well. Maybe for one sentence. We just — I want to point out, and the parties can correct me if I'm wrong, but this issue has already been to the Republican River Compact Administration. Kansas wouldn't agree to it. And there was an arbitration about Nebraska's crediting dispute. We describe that in pages 8 and 9 of our brief, and we support the master's recommendation to reform the compact. Thank you, counsel. Mr. Cookson. Mr. Chief Justice, may it please the Court. This Court should affirm the special master's report except for his word of exemplary damages that is not justified in this case. If I could, I would turn to the Court's questions regarding what is the deal and why should this Court reform the technical appendix C, which is the accounting procedures. The deal between the parties is found in the final settlement stipulation that this Court approved in 2003. Section 4F expressly provides that this compact accounting will not count imported Platte River water supply as part of the Republican River Basin, in part because that's — And the — it went on to say how you will determine whether there is such water supply. That is — It went on to determine that. That is correct. Through a formula. That is correct. And they agreed to that formula, right? Right. But the deal we bought was not the formula. The deal we bought was we're not going to count imported water that is inconsistent with the terms of the contract. Let's assume two parties — I come into an antique store, and I see this item of furniture that I like, and I talk it over with the owner. I say, you know, let's come to a fair price on this. He says, yes, that's what I want to do, too. Let's have a fair price. And we write it down. It's going to be a fair price. And the fair price is $200, okay? It turns out this thing is worth more than $200, okay? But both the antique dealer and I know that this is a game of rolling the dice, that the risks you take when you buy and you sell antiques is that it's worth more. And that's the same risk here. The parties knew that this formula would not be entirely accurate, and they agreed to a fair price, that is, none of this water should be counted. But they said the way to figure out whether this water is coming in or not is this formula. Why shouldn't they be held to that formula? That was the deal. Because in Section 1F of the Final Settlement Stipulations, the parties made it clear that the RRCA could modify the accounting procedures at any time through its process, which, as the SG's office correctly noted, we did. We went through the RRCA, Kansas objected. We went through non-binding arbitration. The master agreed the mistake occurred, sent it back to the RRCA to develop a solution. This was all presented to Kansas in 2007. But under to your point, Your Honor, the deal we made was not to count imported water. Kansas' own expert testified that the purposes of the accounting procedure and the groundwater model are to effectuate the terms of the Final Settlement Stipulation. The master agreed, and it's undisputed between all of the parties that the accounting procedures are acting in direct conflict to both Section 4F of the Final Settlement Stipulation and to Article 3 of the Compact, which allocates water originating from the RRCA. Kennedy, do you agree that ordinary principles of contract law should guide our decision on the reformation issue? Or is this something that's not an ordinary contract? If this were a stipulation in ongoing litigation, I could understand that we want to give the Court substantial power to alter the stipulation. But this stipulation was reached as part of a final judgment that was made, and that case is closed. So isn't it just like a contract? Or is it subject to revision more easily than a contract because it was a stipulation that's closed? It's just like a contract, isn't it? In this instance, Your Honor, the technical appendix is more like the ongoing matter because the parties specifically bargained in Section 1F of the Final Settlement Stipulation that we would be able to modify the accounting procedures. That's just like saying the parties can amend this contract, right? I mean, those procedures take the consent of each one of the parties. So that amounts to saying nothing except what is obvious and would be the law even if it were a contract. So the parties, by mutual agreement, can amend the contract. Does it mean anything different from that? It does, Your Honor, because there's, in the Final Settlement Stipulation, the parties agree we're not going to change it, that there is a non-severability clause. That is the bargain that occurred between the parties. How does it work? I mean, this can't be the first time this came up. The contract, to me, is more like the antique dealer and the customer promised to buy all the Ming vases, and they'll determine if it's a Ming vase according to a technical method in the appendix, and the appendix happens to throw in not only the Ming vases, but all the Tang vases, and nobody thinks they should get the Tang vases. Okay? So that's the deal. So we go to the judge, and one way is reformation, but they say, no, no, it's a contract deal, it's all closed, you can't reform. Another way is rescission. Okay? So there was a mutual mistake, there was sin. Okay. You must have read, there must be thousands of cases with algorithms. I mean, we live in a world where there are algorithms, there are computers, there's Internet, there's this formula, that formula. It can't be the first time that somebody in a contract has made a technical mistake about the algorithm to be used for determining the object. So what does contract courts do? Well, specifically, the Special Master referred to two cases that, before this Court. In Texas v. New Mexico, the parties determined that the 1947 version of an algorithm, the inflow-outflow steady plan to the Pecos River Compact, was completely unreliable. And this Court approved Special Master Bridenstine's reformulation of the inflow- outflow, and that was an appendix to the compact. Here, we're only talking about an appendix to a settlement stipulation that this Court approved. Likewise, in Wisconsin v. Michigan, this Court entered a consent decree dealing with islands in the Lake Michigan between Wisconsin and Michigan, but neglected to address an issue regarding where's the boundary in Green Bay. Kennedy. Is there any authority that a settlement agreement is more subject to reformation than a regular contract? Is there any authority for that proposition? Not that I'm aware of, Your Honor. You agree, don't you, that you couldn't the Special Master couldn't have revised the formula if it had been part of the compact itself? That's correct. Now, why is that? Because the compact is approved by Congress and it is not for the parties, and as this Court said in Alabama v. North Carolina for this Court, to add terms to the compact that's been approved by Congress without congressional authorization. Was the appendix included in it when it was submitted to Congress? No, Your Honor. It was not. That was just added afterwards. In 1943, when the compact was complied, Article 9 provided that at some point the States, the compact administration, which we now know as the RRCA, would meet and establish rules and regulations that were not inconsistent with the compact. That actually did not occur until 1961. I do think, though, it is still the FSS is an agreement between two sovereigns. And I think, putting aside what contract principles may provide as a general matter, that the idea of a Special Master or this Court changing the nature of that agreement is a pretty radical one. But we're not changing that agreement. The agreement in the final settlement stipulation is, do not count imported Platte River water as a public river. And Mr. Cunzin, suppose the following. The parties are there and they're around the table, and everybody agrees we should not count Platte River water, we should only count Republican River water. But everybody also agrees that that's easier said than done. And the devil is in the details. And there are three different plans for three different formulas for how not to count Platte River water, and instead only to count Republican River water. And each of these, the parties think, you know, the parties first, how accurate is that formula? But those formulas also do a range of other things that the parties may care about. And so there's a bargain and a negotiation about which of these three formulas to use in order to reach the result of not counting Platte River water, and in order also to further the parties' other objectives. And one is chosen. Why isn't that one the one that continues to govern under the agreement? Because the parties recognized in negotiating the agreement, and this was recognized by both Special Master McCusick in the first generation and Special Master Chaota, that we were proceeding with the notion that as the technical appendix, Appendix C, the accounting procedures moved forward, we would make changes. We've made roughly 14 changes to the accounting procedure through the process of the RCA and agreement of the compact administrators. And what we have here is a Texas v. New Mexico situation where Kansas has exercised its veto right, and in that case, this Court said that the States may come to this Court and, in this case, the Special Master, to seek vindication of its rights to correct what everyone agrees is a mistake that's not only in violation of the final settlement stipulation, but expanding the terms of the compact beyond what Congress intended. What about the general rule that the specific controls the general? I mean, you have a general statement here, okay, we're not going to count imported water. But then you have a very specific calculation about how you're going to achieve that result. So why doesn't that control? Because in this instance, the specific statement in the deal is we're not going to count imported water supply. The accounting procedures, as all parties testified, including Kansas, was simply the means, the tools, if you will, to effectuate the specific agreement of the parties. Counsel, but it was clear that you knew you shouldn't count it, because that's what the provision says. But then it says, any imported water supply credit shall be calculated in accordance with the RRCA accounting procedures and by using the RRCA groundwater model. So they — it's incorporated directly in that procedure that this is only a credit and that it's going to be — any credit shall be calculated in accordance with the procedure set forth therein. Sotomayor, what gives us the right to the special master or anyone under Reformation principles to create a new procedure? Because the five-run mile protocol is a new procedure that they never agreed to. There's no argument that this is a procedure you put forth. It wasn't part of the original negotiations. This is a Reformation that's one-sided. It's what you want, or two. Maybe Colorado does. So how do we get there? Under contract principles, under equitable principles, how do we get to do that? I think if you look at each of the accounting provision — or each of the provisions of the final settlement stipulation that deal with accounting, you will find that same language that you just quoted. In other words, the parties understood that they were not baking into the final settlement stipulation how they were going to do the accounting. They were going to refer to the technical appendix, which it is. It's an appendix to the final settlement stipulation, that this is how we'll do it and this is how the model will do it. Understanding that at the time the final settlement stipulation and the accounting procedures were agreed to, the parties — the States had still not agreed to the groundwater model, which is the fundamental principle that will do it, and in fact came back to this Court roughly six months later for approval of the groundwater model. So again — Sotomayor, you haven't answered my question. I believe — Which is what contract principle or equitable principle permits us to create a procedure that they haven't agreed to? Because it's the exact same situation that this Court exercised in Texas v. New Mexico with the appendix to that compact, with the inflow-outflow model that the special master referred to. Do you read Texas v. New Mexico as reforming the compact? No. And I don't read what the special master has done here as reforming the compact. This is a technical appendix. Well, or reforming the accounting procedures, I should say. Do you read Texas v. New Mexico as reforming anything? It reforms the inflow-and-outflow study plan to conform to the intent of the parties in the Pecos River Compact. Just by appointing a special master to monitor it over time, correct? That was over a different issue other than the original reformation of the inflow-outflow study that was done at, I believe, 446 U.S. This is a slightly extraneous question, but I'm curious in light of it. Part of this argument is about money. We can deal with that. But this part about the accounting, my instinct is that farmers and others who use the water have to know. And it hurts them when another 5 years goes by without anybody understanding what the procedure is. Our both sides say that, you know, you should be able to work this out. It looks as if what you're facing are 9 people. I'm not speaking for the other 8. I'm just speaking for myself, who couldn't know less about it. All right? And we're supposed to decide whether some system here is going to work or not. And that can be another 5 years. Is there any chance that you all could work this out? I think, Your Honor, that what the special master has presented is not something that requires 5 years to work out. That's true. But they've made an argument that if you look at the contract law, you will see that rescission is the normal remedy, where there's this kind of a mistake, rather than reformation. And you apparently, at some level, agree with that, because what you've pointed to are not normal contract cases. You've pointed to two cases involving State compacts in this Court. And suppose that I think that's actually a difficult question. I would suggest, Your Honor, that it is appropriate, beyond contract principles, as you did in Texas v. New Mexico, to conform the terms of the accounting procedures to the final settlement, so that they are consistent with both the compact and the final settlement stipulation. And to Mr. Chief Justice, to your question, this is significant. As the special master found, had he chosen to apply this retroactively, it would have been a 26-by-20 percent. And on going forward into the future is a significant amount. So it was both material, it was mutual, and it was significant. Alitos, this may be an unfair question, so if you are not prepared to answer it, that's fine. But just out of curiosity, since the – which would you prefer, a decision that agrees with the special master on both reformation and disgorgement, or a decision that agrees with the special master on both reformation and disgorgement? I would agree with your characterization, Your Honor, that from my perspective, that's probably not fair, because we believe the law and the facts justify reformation, they do not justify disgorgement. And they should not – and there is no inherent or implied linkage of the two. And if I might turn to the disgorgement issue, obviously Nebraska accepted to the compact, nor was it – Kagan. Can I ask what that means exactly? You know, because the special master said, well, it wasn't a deliberate breach. But the special master also said essentially what the SG – how the SG characterized it, that you were a conscious wrongdoer, that you failed to act, refused to act in the face of a known risk, and that the quite foreseeable effect of your actions was going to be, unless, you know, there was some very lucky, fortuitous thing that happened, the quite foreseeable effect of your actions was going to be that Kansas didn't have enough water. Your Honor, I would point to two – to that – I would respond to that in two ways. One, the master not only found there was not a deliberate intent to violate at page 111 of his report, but he also said Nebraska did not exercise a consciously opportunistic breach in the nature of an efficient breach at page 131 of his report. But factually, we have accepted to his finding of knowing, and the findings, that Nebraska somehow did nothing. Nebraska seized control of its consumptive use in 2002 while it was still negotiating the compact, and through 2006 reduced its pumping by over 500 million – or 500,000 acre feet, a 35 percent reduction. At the same time, however, Nebraska could not reasonably foresee that its allocations were going to fall even below the historical low period of record in this basin, which was the dust – Didn't the special master say that was the risk that Nebraska should have known? So – and he said, yeah, they did this and that, but it wasn't enough, and it wasn't enough until 2007 that they came into compliance in a way that didn't put Kansas in jeopardy, but he said all along Nebraska knew that Kansas might, well, be the loser because Nebraska didn't take adequate steps. It was aware – it was aware of the risk. And it was aware of the risk to Kansas, right? No, we would not agree with the master's characterization of what was reasonably foreseeable, Your Honor. Well, but assume that the master's characterization as to that holds, that that's a matter of fact, that we're not going to overturn, that he said that you knew that there was a risk and that the risk was a substantial one, that Kansas would end up on the short end of the stick in violation of the compact. I mean, if that's the case, what does it even mean to say that you did not deliberately breach? If you look at the master's report on page 111, he outlines the significant steps that Nebraska took from the beginning, including a substantial rewrite of its state water laws to ensure that its regulatory actions going forward. And we did that in 2004 after this Court approved the final settlement stipulation in 2003. We started reducing pumping in 2002 and in 2003 and in 2004. But again, to get to the characterization of reasonably foreseeable, understand that the compact allocations that you find in the compact before you were based on a 10-year period of the Dust Bowl, the historic low period. It was reasonable for Nebraska to rely that it would not go below the period of the Dust Bowl. And yet in 2005 and 2006, our allocations significantly fell below the Dust Bowl. And had they simply stayed at the Dust Bowl level, Nebraska would have been in compliance in 2005 and 2006 with the added water given to Nebraska by the special master under the imported water supply and the Harlan County EVAP. There was nothing in the historical record to suggest that we would go below the period of the Dust Bowl at the time we were taking action to comply with the compact. And we acted reasonably in measuring our efforts and we continued our efforts when it was clear that we fell short in 2006. We conceded that we violated the compact. We offered to pay Kansas its actual expectation loss, its actual damages. And we moved forward with additional tools so that the next time this occurred, Nebraska would be in a position where it could stay in compliance. And as the master found, with the tools in place now, had we had those in 2002 to 2006, Nebraska would have been in compliance even in the driest condition now of record in the basin. And we've added additional tools should it get drier to address it. So for these reasons, disgorgement is not appropriate. There's no reason to incentivize Nebraska. There's no need to deter Nebraska. Moreover, there's no need for an injunctive relief as the U.S. and Nebraska agree with the special master on this interest. We believe the court should conform the accounting procedures to meet the compact and it should not award disgorgement absent a deliberate act which is not to be found in this case. Scalia Does disgorgement and injunction, do the two go together? No, Your Honor. Scalia If it's inappropriate to issue an injunction, is it always inappropriate to require disgorgement? Are they both looking to the future so that if there is no realistic possibility of future violation, you cannot issue an injunction and you should not require disgorgement? Is that a correct statement? In our view, yes. Disgorgement should not be used as a future-looking tool. Injunctive relief is the appropriate remedy, and in this case, the facts don't justify it. Now, I'm not sure you've answered my question. You say it should not be used as a future tool. So it can be used even though it's not being imposed in order to deter future action? Well, in the context that Kansas sought in this case, they were seeking to, from the initial arbitration through the trial with the master, Kansas sought unjust enrichment as a means of disgorging gain to Nebraska. And they also sought specific injunctive relief, more specific than what they've accepted to the Court now. So they sought both in the context of this litigation. But do I understand your answer to be that disgorgement serves at least an additional function beyond the injunction, sort of an unjust enrichment element? You've got to disgorge your profit in a typical contract case? It does serve that function in a case where, as this Court suggested, there is a deliberate act, yes. Can you get in a normal contract case both your damages and disgorgement? I always thought you were put to the choice. You either sue for your damages or you sue for unjust enrichment. Can you do both? You get your damages plus the other guy's profits. It's our belief, Your Honor, that no, it's that you're correct, that it's you get contract damages. Your Honor, your expectation interests. Thank you. Thank you, counsel. Mr. McAllister, two minutes. Thank you, Mr. Chief Justice, and may it please the Court. I wanted to go back to something Justice Kagan correctly identified, is that when these procedures are negotiated, there are lots of options on the table. And in fact, the groundwater model option the parties chose was not Kansas's first choice. It was Nebraska's first choice. And these kind of tradeoffs were being made, and I think this case is directly analogous to New Hampshire v. Maine, which is talked about in the briefs, where those two States reached a boundary agreement. And the Court said, well, your agreement may not be perfect, but it's you were dealing with some vague terms, some uncertainties, you've done something reasonable, we bless it. Twenty-five years later, New Hampshire came back and said, you know, we made a bad deal. We'd like you to undo it, because we shouldn't have agreed to that 25 years ago. And the Court gave New Hampshire the answer we think you should give Nebraska today, which is, sorry, you made the deal. And just because you now think you have a better way of doing it doesn't mean we should rewrite the contract. If the Court rewrites the contract here, the compact, well, the procedures, which are part and parcel, as the United States recognizes, of the FSS, there's no clear black and white distinction between the procedures and the settlement agreement. They don't work unless they're both present. If you rewrite them now, it opens the door. If Kansas comes up with a better way two years from now to measure this, then we would be able to come back. And if Nebraska says no, we'd come all the way to this Court again saying, you know, there was a mistake, because there was a better way than the five-run solution to do this. Sotomayor Mr. McAllister, how much more are you going to get under the accounting procedures as they exist without the five-mile run? McAllister Yeah, I believe on an annual basis the difference is on the order of 8 to 10,000 acre-feet, so that's the difference in what Nebraska wants that much more taken out of its consumptive use. Sotomayor Give me money. McAllister Oh, what it's worth in money? Well, that's a big dispute. I mean, the master, when he valued the gain, used some figures from Nebraska evidence that it was $362 per acre-foot. There are other ways to try to value the water, and we haven't tried to quantify that amount. The reason it matters to us is it affects, actually, the total amount we get. Roberts Thank you, counsel. The case is submitted.